For the reasons stated, the re-assessment must be set aside, with costs.

---

THE STATE, EX REL. STEPHEN PELL, v. THE MAYOR AND COMMON COUNCIL OF NEWARK.

1. On application for a *mandamus* against the common council, they may call in question the constitutionality of an act which legislates them out of office.
2. The words, "the legislature shall pass no special act conferring corporate powers," in the latter part of paragraph eleven, article four,

section seven, of the constitution, applies only to private corporations, and not to municipal corporations.

3. The legislature may, by special laws, establish townships, cities and counties, and change or alter their exterior lines at will.

4. The internal affairs of cities, towns and counties must be regulated by general laws, where it is practicable to do so.

5. The court, and not the legislature, is the tribunal which must determine whether an object can be accomplished by general legislation.

6. The manner in which ward lines are run, being a matter which concerns only those within the city, affecting exclusively internal affairs, a general law must be framed to change such ward lines, special legislation being prohibited in such cases.

On application for *mandamus*.

Argued at February Term, 1878, before Justices VAN SYCKEL, DIXON and REED.

For the relator, *J. D. Bedle* and *J. Vanatta.*

For the defendants, *H. Young, Thos. N. McCarter* and *F. T. Frelinghuysen.*

The opinion of the court was delivered by

VAN SYCKEL, J.   By an act of the legislature, approved February 15th, 1878, entitled "A further supplement to an act entitled 'An act to revise and amend the charter of the city of Newark,' approved March 11th, 1857," the lines of eleven of the fifteen wards in the city of Newark are changed; the lines of the new wards are specifically defined; the time of holding the charter election is changed from October to April, and the mayor and aldermen are legislated out of office.

By the twenty-third section of the act it is provided "That within fifteen days after the passage of this act, the mayor and common council of said city shall proceed to divide the wards of said city, as hereby constituted, into election districts, and to appoint the necessary inspectors and judges of elections and clerks of elections required by law for

each of the election districts so set off, who shall serve until their successors are elected."

The duty herein enjoined upon them the common council have refused to perform, on the ground that the act is unconstitutional and void by force of article four, section seven, paragraph eleven, of our state constitution, which provides " That the legislature shall not pass private, local or special laws in any of the following enumerated cases, that is to say : Laying out, opening, altering and working roads or highways; vacating any road, town plot, street, alley or public grounds; regulating the internal affairs of towns and counties; appointing local offices or commissions to regulate municipal affairs; selecting, drawing, summoning or empaneling grand or petit jurors; creating, increasing or decreasing the percentage or allowance of public officers, during the term for which said officers were elected or appointed ; changing the law of descent; granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever; granting to any corporation, association or individual the right to lay down railroad tracks; providing for changes of venue in civil or criminal cases; providing for the management and support of free public schools.

" The legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws. The legislature shall pass no special act conferring corporate powers, but they shall pass general laws under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration at the will of the legislature.

" 12. Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."

It is claimed, on behalf of the relator, that the duty of the common council, under the twenty-third section, is merely ministerial, like that of a clerk who is directed by law to administer an official oath, and that, therefore, they will not be permitted to raise the question of constitutionality in this

way.   The cases seem to be widely different.   The duty of a clerk is purely ministerial, and he should not be allowed to obstruct another officer in the exercise of his duty, by calling in question, of his own motion, the legality of his *status;* such a practice would put it in the power of a mere clerk to embarrass in the most serious way the ordinary operations of government.

The common council, upon which the present duty is cast, are in the exercise of the powers of local government for the city, with the duty to continue their functions until they are lawfully displaced.   If they should execute the act in question, there might and probably would be two distinct bodies in existence, each claiming to be the lawfully constituted legislative body of the city.   The consequences which would flow from such a state of things will impel the court to hear the defendants, and refuse a *mandamus* to enforce obedience to the act, if it can be shown to be without authority.

The question presented is whether the act prescribing the duty which is sought to be enforced by the aid of this court is within the prohibition of that clause in the recent amendments to our state constitution, which provides "That the legislature shall not pass private, local or special laws regulating the internal affairs of towns and counties; appointing local offices or commissions to regulate municipal affairs."

It has not been suggested that these amendments were adopted because there was any objection to the mode in which cities, towns or counties had been created, or in which their exterior lines had been altered, or that the power to do so had been abused by the legislature.   The evil consisted in the great diversity of laws which were applied in their government and regulation when erected, and for that reason a limitation was placed upon the method of enacting laws for them.

The limitation is not upon the right to create cities, towns or counties—not upon the right to abolish them or to change their exterior boundaries at pleasure; the prohibition is against passing laws regulating their internal affairs by

special laws, manifestly referring to laws for their government, not to their creation or structure. Established rules of interpretation forbid the giving to the language used, the same effect as if it had provided " That no special act shall be passed in relation to towns or counties." Yet this is the precise force which must be given to the amendment to exclude the legislative right to exercise the power which it before had to establish these political divisions of the state, and to change their exterior lines at will. That the framers understood that it did not have so wide a range may be fairly inferred from the words which immediately follow: "Appointing local offices or commissions to regulate municipal affairs." If for " regulating internal affairs of towns and counties," we read " relating to towns and counties," it would have been too clear for question that local commissions were prohibited, and it would not have been deemed necessary to add those words.

This shows that the force and import of language was carefully considered, and the fact that no apt term was used to forbid the creation, by special laws, of these political divisions of the state and their exterior boundaries, (although the distinction between structure and regulation was in the mind of the framers, as will appear by reference to the clause affecting private corporations,) raises a strong presumption that the language employed was not designed to have that scope.

The words " regulating the internal affairs of towns and counties," are not as comprehensive as the words " relating to towns and counties," and must be considered as narrowing the prohibition ; they were not intended to forbid all special legislation as to these subjects, but only such as regulates internal affairs, leaving the power undisturbed as to the residue. It will be inadmissible to give the narrower words the same force and effect that the wider term would have ; a part cannot be considered as equal to the whole. If so, then what special legislation as to cities, towns and counties is prohibited and what is permitted ?

There are but two classes embraced in the possible scope of special legislation with respect to these subjects—

*First.* That which concerns their creation or erection and boundaries.

*Second.* That which relates to their government and regulation when formed.

The language of the amendment is clearly apt to prohibit the latter, but inappropriate to affect the former.

This construction gives appropriate effect to the language of those who framed the amendments, and when the clause with regard to towns and counties is collated with that which occurs in the latter part of the eleventh paragraph, before cited, the inference is strong that it is the true interpretation. The language used is: "The legislature shall pass no special act conferring corporate powers, but they shall pass general laws under which corporations may be organized, and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration at the will of the legislature."

A careful examination of the paragraph in which this language is found, and of other portions of the instrument containing it, will show that it was not intended to apply to municipal corporations. Municipal corporations had been dealt with before this clause was inserted, and it is reasonable to presume that such provision had been made in regard to them as was deemed necessary and desirable. The word "corporation" is used in the latter clause, which, in common acceptation, denotes a private corporation, while the word "municipal" is used in the prior clause.

In article one, paragraph nineteen, the word "corporation" is used in the sense of private corporation, and in the twentieth paragraph of the same article, are the words "municipal corporation."

These references show that when the framers of the constitution used the word "corporation," they meant one thing, and by "municipal corporation" another; and this view is enforced by the fact that, in the clause now under criticism, there is a provision that the powers granted shall be subject

to repeal or alteration at the will of the legislature. Such language could not have been deemed necessary in a carefully-considered constitutional amendment, intended to apply to municipal corporations, because it had never been supposed that municipal charters could become irrepealable; it manifestly had reference to private corporations, and its purpose was to exclude any claim to irrepealability on their part. Precisely the same guards were not intended to be thrown around two subjects in many respects so totally dissimilar.

The framers of these amendments had already provided for cities, towns and counties; they had prohibited the passage of special laws to regulate their internal affairs, and the appointment of commissions, without employing language appropriate to exclude the right to create them and change their boundaries.

That power was left as fully as it before existed. But when private corporations are provided for, it is declared that no special act shall be passed, conferring corporate power, but general laws shall be passed, under which corporations may be organized and corporate powers of every nature obtained. This is a clear provision for the creation of private corporations, showing that the distinction between formation and government when formed, was not absent from the mind of the framer.

In the clause relating to towns and counties there is no requirement that general laws shall be passed, under which they may be erected. The right is still preserved to the legislature to create cities, towns and counties, and to change their boundaries, by special laws, so as to make them appropriate political districts for the application of general laws establishing uniform rules for their regulation.

The right to create implies and carries with it the power to alter. The amendments with regard to cities, towns and counties did not execute themselves; they had no effect upon the existing state of things. These different bodies retained all the rights, powers and peculiarities which prior legislation had impressed upon them, but they could not be controlled, as

to their internal affairs, by future legislation, except under the form of general laws, subject to the qualifications stated in *Van Riper* v. *Parsons, ante p.* 1.

But when we come to established wards in cities, there is nothing in their character as political sub-divisions, or in the letter of the constitution, which will withdraw them from the operation of the prohibitory clause.

Wards, within themselves, do not possess any power of local government; they are erected exclusively for the purpose of securing representation in the city government. They merely constitute a convenient territorial division of the city, to enable the inhabitants to select representatives to regulate their internal affairs. The common council provides for the lighting of the streets, the maintenance of the poor, the support of the police department, and all other matters affecting the internal affairs of the city. The removal from office of the present members of council, and providing that others shall be elected to fill their places, with equal power to regulate these matters, clearly constitutes a regulation of internal affairs.

If this is denied, it might, with equal plausibility, be argued that the internal movements of a mill were not regulated by a new motive power to which they were geared, or that the owner who used his authority to remove the superintendent of his mill, and put another in his place, did not regulate its internal affairs.

There is no propriety in saying that the internal affairs of cities, towns and counties are regulated by changing their boundaries, but the power that is supreme to overthrow the local government of a city, and order a new election of its common council at will, very effectually regulates its internal affairs.

If the clause is read, "That the legislature shall pass no special or local law, regulating the internal affairs of wards, towns, cities or counties," then ward lines could be defined by special.laws, because only their internal affairs would be within the prohibition ; not their exterior lines. The presumption would be controlling, that the express exclusion of

the right to regulate their internal affairs implied that the power to regulate their exterior lines was to be left unimpaired.

· The change of ward lines directly and immediately affects the city, and is the most effective way in which its internal affairs can be regulated and controlled. It was manifestly the sole aim and object of the act in question to regulate the internal affairs of the city of Newark, and if the law could be enforced, and it failed to accomplish that end, no one would be more sadly disappointed than those who devised this scheme, and procured the passage of the law.

The conclusion that this is a special, local law, regulating the internal affairs of the city, is not, of itself, decisive of this controversy.

In Van Riper v. Parsons, this court has held, at this term, that the clause of the constitution in question was not intended to limit legislation, but to forbid only the doing, by special or local laws, those things that can be done by general laws. While that case remains unreversed, it must be accepted in this court as the correct interpretation of the constitutional provision.

Slight respect will be accorded to it by rejecting the grounds upon which the court manifestly based its construction.

Assuming, as I feel constrained to do, that this law is vicious, if the same end could be attained by general legislation, it becomes necessary to determine what tribunal shall settle that question. If that duty has been committed to the legislature, then it must be presumed that they have discharged it properly, and have found that it could not be done by general law. In that event, their judgment would be final and conclusive, and unreviewable. Does the constitution make the legislature the final arbiter in this matter?

Whether a given enactment is constitutional, involves interpretation and construction—the exercise of purely judicial functions. Policy is as clearly a question for the legislature.

The duty of the several branches of our state government is well defined. No legislative power is conferred upon the

judiciary; no judicial power upon the legislature. It would require very clear language to justify the assertion that in these amendments the people intended to vest judicial power in the law-maker. Such a rule would subvert the theory upon which our system is framed, and disturb the checks and balances by which it is guarded. Whether the legislature has transcended its power, and passed an act in conflict with the constitution, is essentially a question of law, and must necessarily be passed upon by the courts.

These provisions being incorporated into the fundamental law, were designed to establish a fixed and permanent rule, but it is manifest that nothing could be more flexible, if it rests solely in the judgment and discretion of the body upon which it is intended to operate. No standard could be established by which the law-maker could be guided, and what might be rejected at one session as improper, might become a law at the next, and thus the rule would fluctuate with the ever-changing membership in that body, and the validity of an act would depend, not so much upon the fixed rule of the constitution as upon the liberality or strictness with which successive legislatures, under the pressure of local influences, might determine to interpret the restraint upon their own action. From one of the widest fields for the enactment of laws, in which the constitutional restraint was expresslly designed to operate, not upon the courts, but upon the legislative department, in controlling its methods, judicial investigation would be absolutely excluded.

The judiciary might declare that a law was unconstitutional because its title embraced more than one object, or in that it had the effect to take private property for public use, without just compensation, or in any other of the many respects in which the exercise of the legislative function has been hitherto challenged; but in this particular, in which an amendment has been introduced for the express purpose of trammeling the law-making power, its action would be unassailable. That such an interpretation would render the amendment futile in its practical operation, must be apparent to any one who will

Pell v. Newark.

examine the course of legislation during the last two years. It cannot be adopted by the courts without abandoning one of the most important branches of jurisdiction committed to them by the constitution. That the legislature would act in good faith, must be presumed; purity of motive and a desire to keep within the prescribed limitations must be conceded to its members at all times; but that the people should have deliberately framed and imbedded in their organic law an amendment to prohibit special legislation where general laws might be passed, and, at the same time, should have intended to put legislative action beyond review, where there was a clear infraction of the prohibition, is a proposition to which it seems impossible to assent. The mere form in which a law is enacted cannot be conclusive of the question.

In this view of the law, it becomes necessary to consider whether the object aimed at by the act in question could have been accomplished by general legislation.

Of course a general law would not be possible, providing for a change of wards in the city of Newark alone, and defining the lines of such wards by metes and bounds; but that is not the test.

There is no difficulty in framing a general law, authorizing or requiring the common council of every city in the state, under established regulations, to alter the ward lines within their respective cities.

As many checks may be engrafted upon the bestowal of this power as the legislature may see fit to impose, so long as the law is general in its application. There is no legal objection to such grant of authority as to ward lines, that being the direct means through which the granted powers are put into practical operation by the city, in regard to matters exclusively internal.

Mr. Cooley declares that the bestowal of powers of local government on municipal corporations is not to be considered as trenching upon the maxim that legislative power shall not be delegated, since that maxim is to be understood in the light of immemorial usage, which has always recognized the

propriety of vesting in municipal organizations certain powers of local regulation, and which power it cannot be presumed that the framers of our constitution intended to take from them."

Properly speaking, the right of local government, which is conferred on a municipality, constitutes a grant of power, and is not a delegation of legislative function.

All corporations provided as agencies in the administration of state government are public, as distinguished from private corporations. A borough, a city, a township, a county, a school district are all public corporations, but the school district, the township and county are not, while the borough and city are strictly municipal corporations.

All municipal corporations are public bodies created for civil or political purposes, but all political or public corporations are not, in the proper use of language, municipal corporations. Wards cannot, with propriety, be denominated public corporations, because they exercise no power of local government, but are merely assigned and set apart to enable a municipality to use the authority with which it is invested.

Municipal corporations are called into existence at the solicitation or by the assent, actual or supposed, of the persons composing them, for their own interest, advantage and convenience, while townships and counties are created by the sovereign power of the state of its own will, almost exclusively with a view to the policy of the state at large. With few exceptions all the powers and functions of county organizations have a direct and exclusive reference to the general policy of the state, and are in fact but branches of the general administration of that policy.

The right to define, by special laws, the lines of townships and counties is, therefore, one of the highest acts of sovereign legislative power, and it would require a clear expression of intention on the part of the framers of the amendments to induce me to assert that it was their purpose to compel the law-maker to divest himself of this right, and place it elsewhere. In the distribution of the powers of government

under our constitution, purely legislative function cannot be delegated.

Established practice and immemorial usage, in view of which the constitution was adopted, fully sanction the reference to municipal corporations of all matters affecting peculiarly their local affairs.

Nothing can be more exclusively local in its bearing than the way in which ward lines are run; it concerns no one outside of the city limits.

In other states, a more stringent construction of limitations upon special legislation has been adopted, and the courts have held that general laws must be framed to effect a change in ward, township and county lines, by resorting to the delegation of power to the people of those several sub-divisions of the state; but the language in those constitutions is not in all respects similar to our own, and cannot furnish a safe guide to us.

My conclusion is that the writ of *mandamus* must be denied.